IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LORI B. BUSH,

        Plaintiff,

v.                          Civil Action No. 3:07-CV-123

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## SOCIAL SECURITY REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED, ORDER DENYING CLAIMANT'S MOTION TO SUPPLEMENT RECORD, AND ORDER DENYING CLAIMANT'S MOTION TO SUPPLEMENT RECORD WITH LOST TRANSCRIPT.

## I.  Introduction

A.    <u>Background</u>

Plaintiff, Lori Bush, (Claimant), filed her Complaint on September 13, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

December 7, 2007.[2]  Claimant filed her Motion for Summary Judgment on February 11, 2008.[3]

On February 14, 2008, Claimant filed a Motion to Supplement Record and a Motion to

Supplement Transcript with Lost Documents, and a Memorandum in support of each Motion.[4]

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 13.

[4] Docket Nos. 14, 15.

Commissioner filed his Motion for Summary Judgment on March 4, 2008.[5]  Claimant filed a

Reply to Commissioner's Motion on March 14, 2008.[6]

B.    The Pleadings

 1. Brief in Support of Plaintiff's Motion for Summary Judgment.

 2. Plaintiff's Motion to Supplement Record.

 3. Plaintiff's Motion to Supplement Transcript with Lost Documents.

 4. Defendant's Memorandum in Support of His Motion for Summary Judgment.

 3. Plaintiff's Reply Brief in Support of Plaintiff's Motion for Summary Judgment.

C.    Recommendations

For the foregoing reasons, I **RECOMMEND**:

 1. Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not

err at step two or three of the analysis; his assignment to Claimant of a light RFC is supported by

substantial evidence; and there is no evidence the ALJ was biased against Claimant.

 2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same

reasons set forth above.

D.    Orders

For the foregoing reasons, I **ORDER**:

 1. Claimant's Motion to Supplement Record (Doc. No. 14) be **DENIED** because

Claimant failed to demonstrate cause for her failure to incorporate the forms at the prior

proceeding, or that the forms are "material."

---

[5] Docket No. 16.

[6] Docket No. 17.

2.    Claimant's Motion to Supplement Transcript with Lost Documents (Doc. No. 15)

be **<u>DENIED</u>** because Claimant failed to demonstrate the records at issue are "material."

## II. Facts

A.    <u>Procedural History</u>

 Claimant filed an application for Disability Insurance Benefits and Supplemental

Security Income on April 12, 2004, alleging disability since March 24, 2004 due to arthritis,

chest pain-breathing problems, chronic pain in the back-hands-hips-knees-right shoulder.  The

application was denied initially on July 29, 2004 and upon on reconsideration on November 15,

2004.  Claimant requested a hearing before an ALJ, and received a hearing on October 6, 2005.

On April 3, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by

the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth

above.

B.    <u>Personal History</u>

Claimant was forty-seven years old on the date of the October 6, 2005 hearing before the

ALJ.  Claimant completed eighth grade and obtained a GED in 1990, and a CNA license in

2000.  She has prior work experience as a apartment complex manager, cook, nurse's aid, and

cashier/clerk.  (Tr. 81).  Claimant last worked part-time (2.25 hours per day) as a home care

provider for Braxton County Senior Citizens.[7]  (Tr. 81, 97).

C.    <u>Medical History</u>

---

[7] Claimant continued to work as a home care provider for Braxton County Senior Center
until May 3, 2004, past her alleged onset date of disability of March 24, 2004.  (Tr. 115).  The
ALJ determined Claimant's monthly earnings during that time were well below SGA limits, and
did not constitute SGA.  (Tr. 16).

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: March 24, 2004 through April 3, 2006:

**Braxton County Memorial Hospital, 6/18/90 (Tr. 169)**
Diagnosis: Left elbow sprain.

**Braxton County Memorial Hospital, 10/5/94 (Tr. 170)**
Diagnosis: Sprain, right ankle.

**Braxton County Memorial Hospital, 10/5/94 (Tr. 171)**
Radiology Report
Left Ankle: Films of the left ankle disclose no evidence of fracture or dislocation. The bony structures are within the range of normal.
Impression: Normal examination.
Left foot: Films of the left ankle disclose no evidence of fracture or dislocation. The bony structures are within the range of normal.
Impression: Normal examination.

**Braxton County Memorial Hospital, 10/5/95 (Tr. 185)**
Diagnosis: Abdominal muscular strain. Rule out incissional hernia.

**Braxton County Memorial Hospital, 4/18/96 (Tr. 189)**
Diagnosis: Cellulitis Right Foot; Status/post puncture by rusty nail.

**Braxton County Memorial Hospital, 3/14/99 (Tr. 196)**
Radiology Report
Left Ankle Impression: Normal left ankle.
Left Hand Impression: Normal hand.
Left Elbow Impression: Normal elbow.
Cervical Spine Impression: There is mild intervertebral disc space narrowing at the C6-C7 level.

**Dr. Kyer, M.D., Stonewall Jackson Memorial Hospital, 11/29/00 (Tr. 197)**
Diagnosis: Dysfunctional gallbladder.

**Stonewall Jackson Memorial Hospital, 10/12/84 (Tr. 214)**
Postoperative diagnosis: Menometrorrhagia.

**Dr. Skeens, M.D., Braxton County Memorial Hospital, 8/24/02 (Tr.223)**
Impression: Minimally displaced acute fracture distal phalanx first digit.

**West Virginia Department of Health and Human Resources, 5/5/04 (Tr. 235)**
General Physical
Diagnosis: Osteoarthritis, right shoulder/knee pain, CAD.

Is application able to work full time at customary occupation or like work? No. Unable to lift >5.
Is applicant able to perform other full time work? Sedentary only.
What work situations, if any, should be avoided? All but sedentary.
Duration of inability to work full time? > 1 year.

**Dr. Arturo Sabio, M.D., Tri-State Occupational Medicine, West Virginia Disability Determination Service, 6/12/04 (Tr. 240)**

<u>Diagnostic Impression</u>: Diabetes mellitus type 2, osteoarthritis, rotator cuff tear by history right shoulder and bronchial asthma.

<u>Summary</u>: This 45-year-old female complains of hypertension. She had chest pains and she uses nitroglycerin. On this examination, her blood pressure is 106/70. The rest of the vital signs were normal. The patient did not have jugular venous distension. She did not have also edema. She did not arrhythmia. She did not have chest pains. She was not in congestive heart failure. There is a history of shortness of breath. She had a history of chronic bronchitis and bronchial asthma since young age. On this examination, the waiting is entirely effortless. She did not have rales, rhonchi or wheezing. She did not have a cough. There was not accessory muscle recruitment. There was no intercostal muscle retraction. The patient did not have clubbing or cyanosis. She was not in respiratory failure. She complains of diabetes mellitus of five-year duration. On the examination, there was no retinopathy. There were no ulcers. She did not have numbness demonstrated in the upper or lower extremities. There was no evidence of end-organ damage from the hypertension. She had a history of osteoarthritis. She had Heberden's nodes in both hands. She had tenderness in both knees with crepitus on movement. There was also tenderness in the right shoulder with crepitus on movement. On the range of motion, there is normal range of motion in all the joints of the upper and lower extremities as well as the spine. The patient had an antalgic gait. She walks with a cane to help keep her balance, but she is stable at station without the cane. There was no lurching or unpredictability of the gait. The patient was not able to walk on the heels nor with toes, no heel-to-toe and tandem. She was not able to stand on either leg separately because of the pain in both knees. She is able to squat only halfway down because of the pain in both knees. Fine manipulation.

**Disability/Incapacity Evaluation, 6/25/04 (Tr. 251)**

After considering all information a decision has been made that the above client is: Disabled
Remarks:
       Is the client currently performing substantial gainful activity? No
       Does the client have a medically determinable impairment or combination of
       impairments which significantly limits ability to perform basic work activity? Yes.
Does the client's impairment(s) meet or equal the listing of impairments? Yes
Reevaluation: The information submitted indicates that the case must be reevaluated on 4/05 unless the Worker determines that the client needs an earlier evaluation.

**Dr. Franyutti, M.D., DDS Physician, 7/21/04 (Tr. 253)**

<u>Physical RFC Assessment</u>
Exertional Limitations

Occasionally - 20 pounds

Frequently - 10 pounds

Stand and/or walk  - at least 2 hours in an 8-hour workday (2 hours due to abnormal gait and knee pain).

Sit - about 6 hours in an 8 hour workday

Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:

Climbing/balancing/stooping: Occasionally

Kneeling/Crouching/Crawling: Never

Manipulative Limitations: Handling (gross manipulation) limited. Pain reduced ROM/hands.

Visual Limitations: none established

Communicative Limitations: none established

Environmental Limitations: Extreme cold/heat, hazards: avoid concentrated exposure.

Symptoms:

The symptom(s) is attributable, in your judgment, to a medically determinable impairment.

Patient is credible, all considered including ___, exertional ___, pain and reduced ROM of hands_ ___, all considered and RFC reduced to sedentary because of above.

**Braxton Community Health Center, 6/29/04 (Tr. 264)**

Diagnosis: left shoulder pain.

**Braxton Community Health Center, (Tr. 271)**

Certificate to Return to Work or School

Patient Lori Bush has been under my care from __/04 to __ for the treatment of ___ and is unable to return to work/school on ___.

Remarks: Mrs. Bush needs to be on leave indefinitely until definitive care can be performed.

**Braxton Community Health Center, 8/20/03 (Tr. 278)**

Diagnosis: Hypertension, ___.

**Braxton Community Health Center, 6/4/03 (Tr. 282)**

Diagnosis: Chest pain.

**Braxton Community Health Center, 3/15/01 (Tr. 287)**

Diagnosis: Severe lumbar spasm.

**Braxton Community Memorial Hospital, 12/24/96 (Tr. 294)**

Diagnostic Impression: Recurrent ganglion cyst, right wrist.

**Braxton Community Memorial Hospital, 9/19/90 (Tr. 305)**

Final Diagnosis: Carpal Tunnel Syndrome, Right; Incomplete Right Bundle Branch Block.

**Braxton Community Memorial Hospital,7/9/04 (Tr. 310)**

Right Shoulder MRI

Impression: Tendinosis of the rotator cuff. Degenerative change of the acromioclavicular joint.

**Braxton Community Memorial Hospital, 6/25/04 (Tr. 311)**
Right Shoulder Radiology Report
Impression: Normal examination.

**Braxton Community Memorial Hospital, 6/25/04 (Tr. 312)**
MRI Examination of the right shoulder.
Impression: Hypertrophic degenerative changes at the acromioclavicular joint with minimal impingement upon the superior aspect of the supraspinatus muscle. No evidence of rotator cuff tear. There is fluid in the subdeltoid bursa compatible with a diagnosis of bursitis.

**Braxton Community Memorial Hospital, 1/6/04 (Tr. 313)**
Chest Radiology Report
Impression: No evidence of acute disease.

**Braxton Community Memorial Hospital, 7/17/03 (Tr. 314)**
Myocardial Rest and stress spect imaging of the heart.
Impression: No evidence for ischemia or infarction at this level of exercise.

**Dr. Cuadra, M.D., Charleston Area Medical Center Department of Pathology, 10/13/89 (Tr. 321)**
Post op diagnosis: Colitis.

**Dr. John Galey, M.D., St. Joseph's Hospital, 8/25/04 (Tr. 325)**
Postoperative diagnosis: osteoarthritis acromioclavicular joint right shoulder.

**Braxton Community Health Center, 8/25/04 (Tr. 327)**
Diagnosis: Osteoarthritis.

**Dr. John Galey, M.D., 4/14/04 (Tr. 329)**
Diagnosis: AC joint arthritis.

**Dr. John Galey, M.D., 3/31/04 (Tr. 330)**
Diagnosis: A-C IT DA right shoulder.

**Dr. Pascacio, DDS Physician, 9/29/04 (Tr. 331)**
Physical RFC Assessment
Exertional Limitations
        Occasionally - 20 pounds
        Frequently - 10 pounds
        Stand and/or walk  - at least 2 hours in an 8-hour workday (abnormal gait and knee pain)
        Sit - about 6 hours in an 8 hour workday
        Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:
        Climbing/balancing/stooping: Occasionally
        Kneeling/Crouching/Crawling: Never
Manipulative Limitations: Reaching all directions (including overhead): limited, right upper
        extremity.
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Extreme cold/heat, hazards: avoid concentrated exposure.
Symptoms: Symptoms are credible.

**Frank Roman, Ed.D, DDS Physician, 10/29/04 (Tr. 339)**
Psychiatric Review Technique
Medical Dispositions: No medically determinable mental impairments.
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06
        Anxiety-related disorders; 12.08 Personality Disorders.
Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive
        syndrome, as evidenced by at least one of the following: 1) depressive symptoms
        evidenced by at least four of the following: sleep disturbance, decreased energy,
        difficulty concentrating, thoughts of suicide.
Anxiety-Related Disorders: A medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria above: Anxiety disorder.
Personality Disorder: A medically determinable impairment is present that does not precisely
satisfy the diagnostic criteria above: Personality disorder history of antisocial disorder, IED.
Functional Limitation for Listings 12.04, 12.06, 12.08
        Restriction of Activities of Daily Living: Mild
        Difficulties in Maintaining Social Functioning: Moderate
        Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
        Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Braxton Community Health Center, 10/5/04 (Tr. 358)**
Diagnosis: Hyperlipidemia.

**Dr. Boyce, D.O., Braxton Community Health Center, 8/25/04 (Tr. 365)**
Diagnosis: Osteoarthritis.

**Jerry McQuain, MPT, Elk River Physical Therapy, 9/9/04 (Tr. 367)**
Summary: Patient with excellent ROM at this point.  Patient should respond well to PT
consisting of ROM, strengthening, scapular stabilization and education and PRN modalities.

**Linda Cook, M.D., West Virginia University Hospitals, Inc., 8/25/04 (Tr. 370)**
Final Pathologic Diagnosis: Clavicle, right distal, resection: Osteoarthritis; marrow with
trilineage maturation.

**Dr. King, M.D., Braxton County Memorial Hospital, 5/13/05 (Tr. 371)**
MRI Bilateral knee
Left Impression:
1) No evidence of acute abnormality of the left knee.
2) Chronic degenerative changes with mild narrowing of the joint compartments and small osteophytes.  Minimal increased signal in the patella cartilage suggesting mild chrondromalacia patella..
Right Impression: Mild degenerative changes.  No acute abnormalities of the right knee.

**Dr. Leef, M.D., Braxton County Memorial Hospital, 5/13/05 (Tr. 372)**
Left Knee Impression: Essentially negative left knee.
Right Knee Impression: Essentially negative right knee.

**Dr. Pearson, M.D., Braxton Community Memorial Hospital, 12/31/04 (Tr. 375)**
Post-operative diagnosis: 1) Hemorrhoids, 2) Moderate diverticulosis.

**Dr. Pearson, M.D., Braxton Community Memorial Hospital, 11/19/04 (Tr. 377)**
Impression: Rectal bleeding.

**Dr. Waxman, M.D., Orthopedic Surgery, 7/25/05 (Tr. 379)**
Impression: The patient has some chronic chondromalacia patella of both knees.

**Dr. Boyce, D.O., 10/4/05 (Tr. 396)**
Residual Functional Capacity Assessment
-Have you in the past or are you presently treating Mrs. Bush? Yes. From 3/15/01 to present.
-When did you last examine Mrs. Bush in person? 9/20/05
-Please describe Mrs. Bush's present diagnoses: DM, DA, depression, hyperlipidemia, chest pain.
-Impairments and symptoms alleged by claimant:
  -severe osteoarthritis of entire spine, shoulders, hands and knees.
  -bilateral knee pain/crepitus and left knee instability.
  -H/O asthma and chronic obstructive pulmonary disorder.
  -diabetes mellitus, type-II adult onset.
  -chronic chest pain, uses nitroglycerin.
  -diverticulitis and colitis.
  -migraine headaches, treated with imitrex injections.
  -chronic low back and upper back pain with radiculopathy.
  -h/o bilateral carpal tunnel surgery, c/o pain and swelling of hands impairing her ability to grasp and manipulate.
  -chrondromalacia of the knees.
  -anxiety and depression, taking psychotropic medications.
  -decreased vision, corrected vision as of 6/12/04: 20/20 on the right and 20/20 on the left.  Also C/I intermittent bluriness.
  -hypertension and dyslipidemia.

-other.

-Are the above listing impairments/symptoms consistent or inconsistent with your clinical records and observations. Yes.

-Which, if any, of the following levels of the work-activity would the patient be capable of doing for an 8-hour day based upon their physical impairments alone.

    -Heavy: walking and standing most of the time lifting 50 pounds frequently and up to 100 pounds occasionally: No

    -Medium: walking and standing most of the time lifting 25 pounds frequently and up to 50 pounds occasionally: No

    -Light: a significant amount of walking and standing lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling: No

    -Sedentary: Sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds: Yes

-How long would the patient be able to perform the following activities in view of her physical impairments?

    Stand at one time: 15 min

    Walk at one time: 15 min

    If alternately walking and standing were combined - how many total hours per 8-hour work day would patient be able to be up on his/her feet? 3-4 hours/

-Must patient alternate positions frequently? Yes

-Would the patient be restricted from performing any of the following activities due to their physical impairments alone? Yes.

    Climbing/balancing/stoop/bend/kneeling/crouching/crawling: never

    Stretching/reaching/squatting: infrequent.

-Does the patient's condition prevent work activity that involves any of the following?

    Machinery/noise: avoid concentrated exposure.

    Excessive humidity/cold or hot temperatures/environmental hazards: avoid even moderate exposure.

    Fumes/dust: avoid all exposure

-Would it be advisable or necessary for the patient to recline or lie down during the day with feet up? No.

-Would it be advisable or necessary for the patient to have frequent rest periods sitting during the day? Yes.

-Would the patient be expected to experience chronic pain on the basis of the impairments found by you? Yes. Chronic moderate.

-Would the patient be expected to experience intermittent pain that would be considered severe? Yes.

-In order for the patient to be able to stand or walk, does the patient need an assisting devise? No.

-Must the patient alternate positions frequently? Yes.

-Can the patient use feet/legs for repetitive movements such as in pushing or pulling leg-feet controls?

    Right foot: No

    Left foot: No

Explain: secondary to knee pain

-Can the patient use hands for repetitive action in a job where repetition or prolonged use of hands is required?

Simple grasping: Yes

Arm controls: No

Fine manipulation: Yes

-In your opinion, is the patient capable of performing a full-time job, that is 8 hours per day, five days per week, on a sustained basis? No. Pain.

-In your opinion, does Mrs. Bush have a degree of "functional overlay" i.e. does she have a mental impairment that in combination with her other impairments result in a greater degree of disability than either the physical or mental impairment alone would indicate? No.

-In your opinion, would the degree of severity of the impairments found by you today have been the same from 3/23/01 and have they lasted or do you expect them to last for at least 12 months? No.

-Do you feel Mrs. Bush was disabled from all full-time work activity on 3/32/01 and continues to be so at this time? Yes.

**Cynthia Hagan, M.A, Chameleon Health Care, 10/5/05 (Tr. 403)**

Psychological Evaluation

Diagnostic Impression:

Axis I: Major depressive disorder, recurrent, severe.

Generalized anxiety disorder.

Axis II: No diagnosis.

Axis III: osteoarthritis, chronic headaches, back pain, chest pains, cardiopulmonary lung disease, diverticulosis, and diabetes.

Axis IV: Economic problem; vocational problem.

Axis V: 52

Summary/Recommendations: Mrs. Bush is a 47-year old Caucasian female who was referred to assess her depressive and anxious symptoms. She is also applying for disability benefits. Mrs. Bush reports severe and pervasive physical symptoms. She complains of osteoarthritis, chronic headaches, back pain, chest pains, cardiopulmonary lung disease, diverticulosis, and diabetes. Her cognitive functioning was estimated to be in the Low Average range. Her achievement scores in reading were commensurate with her ability scores. Depressive and anxious symptoms were measured within the severe range. Suicidal ideation was also noted.

**Cynthia Hagan, 10/5/05 (Tr. 412)**

Mental RFC Assessment

Limitations in understanding, remembering, and carrying out instructions:

Understand and remember short, simple instructions: mild

Carry out short, simply instructions: mild

Understand and remember detailed instructions: mild

Carry out detailed instructions: mild

Exercise judgment or make simply work-related decisions: mild

Short-term memory was measured below average on the MSE.

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:

Sustained attention and concentration for extended periods: mild

Maintaining regular attendance and punctuality: moderate

Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

> Symptoms of anxiety and depression can decrease concentration at times emotional difficulty, as severe as they are, would likely affect work reliability.

Limitations in social functioning in a normal competitive work environment:

Interacting appropriately with the public: mild

Responding appropriately to direction and criticism from supervisors: moderate

Working on co-ordination with others without being unduly distracted by them: mild

Working in co-ordination with others without unduly distracting them: mild

Maintaining acceptable standards of grooming and hygiene: mild

Maintaining acceptable standards of courtesy and behavior: mild

Relating predictably in social situations in the workplace without exhibiting behavioral extremes: moderate

Demonstrating reliability: moderate

Ability to ask simple questions or request assistance from coworkers or supervisors: mild

> Depression and anxiety syndrome would decrease social reliability and increase sensitivity to criticism.

Adaptation in a work-setting

Ability to respond to changes in the work setting or work processes: moderate

Ability to be aware of normal hazards and take appropriate precautions: mild

> Depression and anxious symptoms would likely decrease adaptability. It may also decrease concentration at this time.

Functioning independently in a competitive work-setting

Carrying out an ordinary work routine without special supervision: moderate

Setting realistic goals and making plans independently of others: moderate

Traveling independently in unfamiliar places: none

> Below average short-term memory, combined with depressive and anxious symptoms would decrease functioning in above areas.

Limitations in work adjustment

Ability to tolerate ordinary work stress: moderate

> Depressive and anxious symptoms would decrease stress tolerance.

Duration of impairments/limitations

> This person has alleged disability to work since 3/23/01. The period under consideration extends from 12/01/99 through present.
>
> Do you feel that the impairments and limitations which you have identified have probably existed at their current level of severity since ___, the alleged onset date? Yes

**Cynthia Hagan, 10/5/05 (Tr. 418)**

Psychiatric Review Technique

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06 Anxiety-related disorders.

Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: 1) depressive symptoms evidenced by at least four of the following: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; decreased energy, thoughts of suicide.

Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: 1) Generalized persistent anxiety accompanied by three of the following: motor tension; autonomic hyperactivity; apprehensive expectation; vigilance and scanning.

Functional Limitation for Listings 12.04, 12.06.
>Restriction of Activities of Daily Living: Moderate.
>Difficulties in Maintaining Social Functioning: Moderate.
>Difficulties in Maintaining Concentration, Persistence or Pace: Moderate.
>Episodes of Decompensation, each of extended duration: None

**Dr. Pearson, M.D., Braxton County Memorial Hospital, 1/14/05 (Tr. 454)**

Mrs. Bush is here for followup after undergoing colonoscopy performed for rectal bleeding. She has had no further episodes of bleeding and was found only to have hemorrhoids and moderate diverticulosis. I did recommend high-fiber diet as well as a high-fiber supplement. She is to follow up again as needed and can return if any problems.

**Dr. Galey, M.D., 4/19/06 (Tr. 460)**

Assessment: This woman has evidence of a mild adhesive capsulitis. An x-ray was taken of her humerus today to be sure she doesn't have any obvious boney lesion where she was tender over the midshaft of the humerus.

**Dr. Galey, M.D., 3/22/06 (Tr. 461)**

Assessment: This woman has impingement syndrome, right shoulder.

**Dr. Galey, M.D., 4/19/06 (Tr. 463)**

Assessment: This woman had De Quervain's disease, right wrist.

**Dr. Galey, M.D., 4/14/04 (Tr. 468)**

Diagnosis: AC joint arthritis right shoulder.

**Dr. Galey, M.D., Braxton County Memorial Hospital, 2/15/06 (Tr. 470)**

Post-operative diagnosis: De Quervain disease right wrist.

**Dr. Galey, M.D., St. Joseph's Hospital, 8/25/04 (Tr. 471)**

Post operative diagnosis: Osteoarthritis acromioclavicular joint right shoulder

**Dr. Smith, M.D., Braxton County Memorial Hospital, 4/19/06 (Tr. 472)**

Right Humerus - two views.
Impression: Normal Examination.

**Dr. Reifstack, M.D., 12/26/05 (Tr. 477)**
Right wrist impression: No gross osseous abnormality is noted.

**Dr. Boyce, D.O., 1/12/06 (Tr. 480)**
Preop diagnosis: Biceps tendonitis.

**Dr. Galey, M.D., 4/19/06 (Tr. 482)**
Post-operative diagnosis: De Quervain's disease, right wrist.

**Ami Cook, CM, United Summit Center Initial Assessment, 5/19/06 (Tr. 487)**
Mental Status: Beth was oriented times four. Beth is clean and appropriately dressed. Beth's mood is dysphoric. Beth's speech is normal and goal directed. Affect anxious, sociability moderately withdrawn.
Diagnosis from DSM-IV: Beth is diagnosed with Major Depressive Disorder due to her history of multiple episodes of depression and moderate severity.

**Braxton Community Health Center, 12/15/05 (Tr. 496)**
Diagnosis: Type 2 DM; anxiety.

**Braxton Community Health Center, 3/8/06 (Tr. 502)**
Diagnosis: Somatic dysfunction. Depression, Type 2 DM.

**Braxton Community Health Center, 4/21/06 (Tr. 505)**
Diagnosis: depression; fibromyalgia.

**Braxton Community Health Center, 5/5/06 (Tr. 506)**
Diagnosis:...somatoform dysfunction.

**Dr. Boyce, D.O., West Virginia Department of Health and Human Resources, 5/5/  (Tr. 508)**
General Physical (Adults)
Describe in detail any pain: Right shoulder pain, right knee pain.
Diagnosis: osteoarthritis, right shoulder/knee pain, CAD.
Applicant's ability to work full-time
    Is applicant able to work full time at customary occupation or like work? No. Unable to lift >5.
    Is applicant able to perform other full time work? Sedentary only.
    What work situations, if any, should be avoided? All but sedentary.
    Duration of inability to work full time: > one year.
No surgery ever recommended.

**Dr. Boyce, D.O., West Virginia Department of Health and Human Resources, 4/22/05 (Tr. 522)**

General Physical (Adults)

Abnormal: Arteriosclerosis - limping gait, ___.

Describe in detail any pain: Right knee pain, right low back pain.

Diagnosis: Depression, ___.

Applicant's ability to work full-time

    Is applicant able to work full time at customary occupation or like work? No.___**.**

    Is applicant able to perform other full time work? No.

    Duration of inability to work full time: > one year.


**Disability/Incapacity Evaluation, 5/6/05 (Tr. 533)**

After considering all information a decision has been made that the above client is: Disabled

Remarks:

    Is the client currently performing substantial gainful activity? No

    Does the client have a medically determinable impairment or combination of impairments which significantly limits ability to perform basic work activity? Yes.

    Does the client's impairment(s) meet or equal the listing of impairments? Yes

Reevaluation: The information submitted indicates that the case must be reevaluated on 6/06 unless the Worker determines that the client needs an earlier evaluation.


**Stonewall Jackson Memorial Hospital, 10/17/06 (Tr. 553)**

Image of entire spine:

Impression: Mild scoliotic changes with no evidence for fracture or subluxation. Degenerative disk disease is seen in the lower cervical spine.


**Foot and Ankle Center of Clarksburg, 11/6/06 (Tr. 558)**

Neurological exam: right and left - intact.

Musculoskeletal exam: normal ROM.

Gait evaluation: normal gait.

Diagnosis: soft tissue mass right ankle; DM.


**Dr. Leef, M.D., Braxton County Memorial Hospital 11/7/06 (Tr. 562)**

Impression: Opaque density in the distal soft tissues possibly representing a calcification or a foreign body.


**Dr. Connor, M.D., Braxton County Memorial Hospital, 2/16/07 (Tr. 570)**

Chest radiology:

Impression: Normal chest.


**Dr. Rush, M.D., Braxton County, 11/1/06 (Tr. 574)**

Mental Status Exam: The patient is clean and appropriately dressed. Pleasant and cooperative. Eye contact is good. Speech is spontaneous, goal-directed, and appropriate. Mood and affect are much more pleasant and euthymic. Denies difficulty with sleep or appetite. Denies harmful

or psychotic thoughts.

<u>Assessment:</u>

Axis I: Major Depressive Disorder, Moderate

  Anxiety Disorder, NOS

   Nicotine Dependence

  Bereavement

Axis II: Personality Disorder, NOS

Axis III: Diabetes

   COPD

   Chronic Pain.


**<u>Dr. Rush, M.D., Braxton County, 10/4/06 (Tr. 575)</u>**

<u>Mental Status Exam</u>: The patient is clean and appropriately dressed.  Pleasant and cooperative. Eye contact was good.  Speech is spontaneous, goal-directed, and appropriate.  Mood is somewhat dysphoric; affect euthymic, much improved from previous evaluation. Denies difficulty with sleep or appetite.  Denies harmful or psychotic thoughts.

<u>Assessment</u>

Axis I: Major Depressive Disorder, Moderate

  Anxiety Disorder, NOS

   Nicotine Dependence

   Bereavement

Axis II: Personality Disorder, NOS

Axis III: Diabetes

   COPD

   Chronic Pain


**<u>Ami Cook, United Summit Center Review Assessment, 11/15/06 (Tr. 576)</u>**

<u>Mental Status</u>: Beth's mood was labile, affect appropriate. Speech rate and flow normal, thought process goal oriented.  Beth was dressed appropriately and well groomed.  Sociability moderately withdrawn.  Beth denies any homicidal ideations or psychotic thoughts.  Beth is having mild suicidal ideations with no plan or intent.  Beth was oriented 4/4.


**<u>Dr. Rush, M.D., Braxton County, 1/24/07 (Tr. 578)</u>**

<u>Mental Status Exam</u>: The patient is clean and appropriately dressed. Strong cigarette odor. Pleasant and cooperative.  Eye contact is good. Speech spontaneous, goal-directed.  Mood is still dysphoric; affect euthymic.  Reports difficulty with sleep.  No harmful or psychotic thoughts.

<u>Assessment:</u>

  Axis I: Major Depressive Disorder, Moderate

   Anxiety Disorder, NOS

    Nicotine Dependence

    Bereavement

  Axis II: Personality Disorder, NOS

  Axis III: Diabetes

    COPD

Chronic pain.

**Ami Cook, United Summit Center Review Assessment, 2/12/07 (Tr. 579)**
Mental Status: Beth's mood dysophoric, affect blunted.  Speech rate and flow wnl, thought content wnl.  Beth presented dressed appropriately and well groomed.  Judgment and insight are fair.  Sociability moderately withdrawn.  Beth denies any homicidal ideations or psychotic thoughts, however she does admit to mild suicidal ideations with no plan or intent.  Beth was oriented 4/4.  Beth was calm and cooperative throughout interview.

**Dr. Kline, M.D., 11/13/06 (Tr. 594)**
Assessment
       1) depression secondary to situational exogenous depression
       2) arthritis, etiology uncertain
       3) diabetes.
       4) COPD
       5) migraine headaches

**Dr. Galey, M.D., 4/19/06 (Tr. 605)**
Assessment: This woman has evidence of a mild adhesive capsulitis.  An x-ray was taken at her humerus today to be sure that she doesn't have any obvious lesion where she said she was tender over the midshaft of the humerus.

**Dr. Galey, M.D., 6/14/06 (Tr. 606)**
Chief complaint: "My shoulder is so much better."
Assessment: I explained to her that she does not seem to have a frozen shoulder, which is resolving and that the last motion to get back is the internal rotation.

**Dr. Galey, M.D., St. Joseph's Hospital, 2/9/07 (Tr. 607)**
Assessment: This woman has a medial epicondylitis, which didn't appear to be particularly severe today.  She may also have a very mild ulnar neuritis.

**Sally Stewart, D.O., West Virginia Department of Health and Human Resources, 10/27/06 (Tr. 608)**
Date of last patient contact: prior to today. 10/24/06.
Prognosis: Poor
Length of time incapacity/disability is expected to last: indefinite.
Employment limitation: Most all types except possible telephone work of some sort.
In this individual's incapacity or disability such that it is necessary for someone to stay in the home with him on a substantially continuous basis? No.
In this individual able to care for children under age six? No.

**Sally Stewart, D.O., West Virginia Department of Health and Human Resources, 10/27/06 (Tr. 609)**
General Physical (Adults)

<u>Abnormal</u>: moderately obese abdomen; increased crepitus both knees and shoulders. Arthritic __ both hands.

<u>Describe in detail any pain</u>: When I try to work, feels like knife twisting in lower spine. Knees feel like sandpaper. I can't keep my balance. My hands cramp and  ache.

<u>Diagnosis</u>:

      Major: Osteoarthritis. IDDM

      Minor: Depression/anxiety. ___.

<u>Applicant's ability to work full-time</u>:

      Is applicant able to work full time at customary occupation or like work? No.__. Multiple physical, mental, and endocrinological disorders to __ most any type of employment.

      Is applicant able to perform other full time work? No. As above.

      What work situations, if any, should be avoided? Most all except possible phone work.

      Duration of inability to work full time: Indefinite.


**<u>Dr. Boyce, D.O., Braxton Community Health Center, 6/2/06 (Doc. No. 15)</u>**

<u>History of Present Illness</u>: The patient presents for follow up of diffuse myalgias and back pain. She states that she has been going to physical therapy for treatment of shoulder pain with some minimal success.  In addition, because of multiple stressors at home including her own pain, her husband's health, taking care of her grandkids, as well as financial hardships at home that she has had increased emotional stress and depression.

<u>Physical examination</u>: The patient appears depressed, anxious, moderately uncomfortable.

<u>Assessment and Plan</u>:

      1) Osteoarthritis

      2) Somatic dysfunction

      3) Type II diabetes mellitus controlled.

      4) Stress induced depression and anxiety.


**<u>Dr. Rush, M.D., United Summit Center, 6/28/06 (Doc. No. 15)</u>**

<u>Chief Complaint</u>: "Depression."

<u>Mental Status Examination</u>: Beth is a 47-year-old, married, white female patient, who appears her stated age.  She is alert and oriented.  She is clean and appropriately dressed.  She is somewhat overweight.  Eve contact is good.  Her speech is spontaneous, goal-directed, and appropriate.  Her mood is depressed; her affect labile.  She was tearful throughout part of the exam.  Reports difficulty with sleep.  Reports a normal appetite. Reports passive suicidal thoughts, but states she would never do anything to hurt herself; she just sometimes wishes something would happen that would kill her.  Denies any suicidal ideation.  Denies any history of auditory or visual hallucinations.  Reports difficulty with attention and concentration.  Reports getting angry easily.  Insight and judgment is fair.

<u>Assessment</u>:

      Axis I: Major Depressive Disorder, Moderate

           Anxiety Disorder, NOS

           Nicotine Dependence

      Axis II: Personality Disorder, NOS

      Axis III: Diabetes, COPD, chronic pain.

Axis IV: Psycho-Social Stressors, Severe, with problems with primary support group, multiple medical problems, financial problems.
Axis V: GAF of 50.

**Dr. Rush, M.D., United Summit Center, 7/12/06 (Doc. No. 15)**

Mental Status Exam: The patient is clean and appropriately dressed.  She was pleasant and cooperative.  Eve contact was good. Speech was spontaneous, and appropriate.  Mood and affect are euthymic.  Denies any harmful or psychotic thoughts.  Denies any difficulty with sleep or appetite.
Assessment:
    Axis I: Major Depressive Disorder without Psychotic Features
    Axis II: Generalized Anxiety Disorder

**Dr. Rush, M.D., United Summit Center, 8/9/06 (Doc. No. 15)**

Mental Status Exam: The patient is clean and appropriately dressed.  She was pleasant and cooperative.  Eve contact was good.  Her speech is spontaneous.  Her mood is very depressed; her affect labile.  She was tearful throughout the interview.  Reports difficulty with sleep.  She has had a reduction in her appetite, due to this incident.  Denies any harmful or psychotic thoughts.
Assessment:
    Axis I: Major Depressive Disorder, Moderate
            Anxiety Disorder, NOS
            Nicotine Dependence
    Axis II: Personality Disorder, NOS
    Axis III: Diabetes, COPD, Chronic Pain.

**Ami E. Cook, United Summit Center, Review Assessment, 8/28/06 (Doc. No. 15)**

Mental Status: Lori's mood was dysphoric, affect anxious.  Speech rate and flow normal, thought process goal oriented.  Lori was dressed appropriately and clean.  Sociability withdrawn moderately.  Lori denies homicidal ideations.  Denies any hallucinations.

**Dr. Rush, M.D., United Summit Center, 10/4/06 (Doc. No. 15)**

Subjective: The patient comes in doing a little better than on her previous visit.  When I saw her in August, her 29-year-old son had just died suddenly from a massive heart attack.
Mental Status Exam: The patient is clean and appropriately dressed.  She was pleasant and cooperative.  Eve contact was good.  Speech is spontaneous, goal-directed, and appropriate.  Mood is somewhat dysphoric, affect euthymic, much improved from previous evaluation.  Denies difficulty with sleep or appetite.  Denies harmful or psychotic thoughts.
Assessment:
    Axis I: Major Depressive Disorder, Moderate
            Anxiety Disorder, NOS
            Nicotine Dependence
            Bereavement
    Axis II: Personality Disorder, NOS

Axis III: Diabetes, COPD, Chronic Pain

D.    Testimonial Evidence

Testimony was taken at the April 3, 2006 hearing. The following portions of the testimony are relevant to the disposition of the case.

Q    All right. And when you finally quit entirely, what was the reason that you stopped?

A    Well, my hands, I couldn't do most of the tasks that I was required to do.

Q    Okay.

A    I couldn't stay on my feet long enough.

Q    So because of your health.

A    Uh-huh.

Q    Now, I noted that you came into the hearing room with a cane.

A    Yes, ma'am.

Q    And approximately how long have you been using the cane?

A    It's been over two years.

Q    Okay. Was this something that was prescribed for you?

A    Dr. Boise asked me if, you know, I would use one if he gave it to me and I told him that I had one, you know, available.

Q    So this was at Dr. Boise's suggestion, but you didn't need an actual prescription?

*                *                *

Q    All right. Now, I'm going to ask you a little bit more about your health history and, first of all, I'd like to ask you if you have problems with your, your bones and your joints.

A        Yes, ma'am.

Q        Could you tell me what kind of problems you have and what areas are affected?

A        Well, there's pain, swelling.  I've got, I don't know what you would call them, knots coming up on the joints in my hands.

Q        All right.  Could I ask you to kind of hold your hands up?

ATTY        Judge, can you zoom in?

CLMT        I don't think he can see.

ATTY        To see that?  Her, the joints appear to be enlarged in the middle of the joints and then in the index finger on the left hand - -

ALJ        Uh-huh.

ATTY        It's - -

CLMT        And this one.

ATTY        - - it's deviated.  Little bit more.  Let's see.

ALJ        All right.

ATTY        All right.  Okay.

RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        And could you tell me about your hands, what difficulty you have with them?

A        It's, I can't hardly grasp things.  I drop things.  I can't, as far as preparing a meal, pealing things, it takes me forever because my hands are, the joints are so sore.

Q        Okay.  Well, I notice, which hand do you use to carry your cane?

A        It really doesn't make any difference because it's just used to help balance me to keep me from falling.  Usually the right side though.

Q       Okay.  So it's not so much for weight baring as just balance.

A       Yes, ma'am.

Q       Now, you did mention you'd had some, some falls were there bad falls involved or just stumbling?  What happened?

A       No, I end up bruising my backside, my tailbone once.

Q       Okay.  How much of the time do you use your cane?

A       If I'm going out somewhere, grocery store, you know, for, if I have to go out, doctor's office.

Q       But not usually at home?

A       Not unless I'm going to be out in the yard, which I don't do.

Q       Do you have to use, do you have to hold to any furniture in the house or can you walk unassisted throughout your house?

A       Most of the time I can do it unassisted, but - -

Q       All right.

A       - - there's certain days that my legs will shake more.  I'm more unsteady.

Q       Okay.   Now, you told us about your hands and you said griping and grasping.  As far as the feeling in your fingers, you, you don't have any numbness or anything like that in your fingers?

A       No.

Q       All right.  How about your elbows and your shoulders?

A       My shoulders, I have arthritis in both of them.

Q       All right.  And have you had some surgery on your shoulder?

A       I had surgery on my right shoulder.

Q       That was Dr. Galey [phonetic]?

A       Yes, ma'am.

Q       And I believe that was maybe August of 2004.

A       Yes, ma'am.

Q       Since that time, how have you gotten along with the shoulder?

A       I still have trouble with it.

Q       Uh-huh.

A       I mean it still hurts.  I can't lift anything heavy with that side.

Q       Okay.  And any particular problem with the left shoulder?

A       Arthritis.  It hurts.

Q       Okay.  But no procedures on that.

A       No, ma'am.

Q       Have you had shots in your shoulders?

A       Yes, ma'am.

Q       Both or one?

A       Both.

Q       Who, who has given you the shots?

A       Dr. Fatini [phonetic] and before that, Dr. Gibbon [phonetic].

Q       Oh, so we're talking some years ago?

A       Yes, ma'am.

Q       And how about recently?

A        Any shots in recent years?

Q        Dr. Boise and shots in my knees.

A        Okay.

Q        Now, you've told us about your, your shoulder.  Go ahead.

A        And he, he also gave me two shots in my, my shoulder as well.

Q        And in your knees.  As far as your elbows, are they, are your elbows all right?

A        They're tender, but they're okay.

Q        Okay.  Now, how does, do the shoulders or what impact do the shoulders have on your ability to use your arms or move them around whenever you need to do it?

A        Like I said, I can't lift anything.  It, - -

Q        How about, how about reaching?  Do you have any difficulty reaching?

A        Yeah.  Reaching up.

Q        Uh-huh.

A        If I try to reach up, I can feel my shoulders pop.

Q        Okay.

A        And 9 out of 10 I drop what I tried to reach for.

Q        All right.  Do you drive?

A        Short distance, not long.  My daughter drives me.

Q        Any difficulty as far as holding your hand out in front of you for, for driving or maybe holding a newspaper to read?  Anything like that?

A        My arm, they will start to get, feel like they're going to sleep.

Q        Uh-huh.

A       Tingly, numb.

Q       All right.  Does the shoulder pain, is it impacted in any way by repetitive motion?
In other words, if you're using your arms to reach out in front or to the side or overhead, any
particular  difficult as far sat he number of times you have to do it?

A       Yes, ma'am.

Q       Could you tell me about that?

A       The, if I'd have to do it for very long - -

Q       Uh-huh.

A       - - out, I, they get shaky, real shaky.

Q       Uh-huh.  Okay.

A       I can't keep them steady.

Q       All right.  Now, do you have difficulty with your, with your neck or your spine?

A       Yes, ma'am.

Q       Could you tell me about that?

A       I go to the doctor every two weeks to have my back and my neck readjusted.

Q       Now, is that what he calls OMT?

A       Uh-huh.

Q       - - therapy?

A       Uh-huh.

Q       Does Dr. Boise do that himself?

A       Yes, ma'am.

Q       And so he works on your entire spine?

A       Yes, ma'am.

Q       Have you had or do you have any difficulty as far as turning your head from side to side or looking up or down?

A       Yes, ma'am.

Q       What difficulty do you have?

A       Turning to the right.

Q       Uh-huh.

A       There's pain from here down.

Q       Now, you say from the right down?

A       This pain, it runs down through here.

Q       All right.  Now, you're pointing down the side of your neck and on the top of your right shoulder?

A       It's in that, that bone.

*                    *                    *

Q       Okay.  And the muscle spasms that he is treating, meaning Dr. Boise, is treating you -  A       Uh-huh.

Q       - - with medication, where are the muscle spasms?  Where do they occur?

A       The right side of my neck.  It's the muscles there.

Q       Uh-huh.

A       And below my waist - -

Q       Uh-huh.

A       It's the muscles on each side of my spine right there.

Q        Okay.  And, well, I didn't ask you about back pain.  We talked about your neck.  Tell me about your back.  Where does it hurt and how long?

A        It's from my tailbone up just a little past my waist.  I can reach over and pick up a pencil or anything that's light, a dish towel anything, at times and I won't be able to straighten back up.

*                    *                    *

Q        Do you have any trouble dressing yourself, putting your shoes and socks on?

A        Yes.

Q        Okay.  How often do you have difficulty with that?

A        Everyday.

Q        What is the difficulty?  What aspect of getting dressed is the problem?

A        Do you want to talk about something that has buttons?

Q        Uh-huh.

A        I've more or less traded them in for either pullover or snap.  I, it's hard for me to fasten the hooks on my bra.

Q        Okay.

A        And I have shoes that have laces.  I got them so that I can just slip them on instead of have to tie them.

Q        Okay.

A        And the new ones that they gave me for, because I'm diabetic - -

Q        Uh-huh.

A        - - they've got velcro.

Q       As far as putting on your outer wear, are you able to do that all right?

A       It's when I say it's hard to button anything that has to do with buttoning.

                    *           *           *

Q       So far.  All right.  Let me ask you a little bit about any limitations that you have. You've spoken several times about lifting.  Could you tell me approximately how much you can lift and carry on a regular basis without causing yourself any undue pain or strain?  Think about what you may handle around the house or shopping or something like that.

A       Picking up a twelve pack of soda is hard to lift.  I'd say a five pound bag of sugar or flour.

Q       Okay.

A       Seems like anything heavier would put strain on my back.

Q       All right.  Are you comfortable in a seated position?

A       No, ma'am.

Q       Approximately how long do you feel that you could sit in a normal chair such as you're in now, which is somewhat padded with arms and feet on the floor.  Approximately how long could you sit in a normal position before you would be uncomfortable enough that you would need to get up and move around?

A       As long as I can keep shifting myself around, you know, I can sit there for a while.

Q       Give me an - -

A       Maybe 30 minutes.  It gets really, really rough after that.

Q       Okay.  Now, what about standing?  Approximately how long do you feel that you

could stand before you get off your feet?  Now, think about maybe a checkout line in the grocery store - -

Q        A        Uh-huh.

Q        - - or at a counter or something like that.

A        It's usually when I, I try to make my doctor's appointment and my trip to the store at the same time.  So it's probably a couple of hours that I'm on my feet at the most.  Because I write a list and what's on that list, that's what I get and I leave.

Q        Okay.  In the course of your normal day, approximately how long are you on your feet if you're not going outside?

A        If I'm not going out?  Hour, hour and a half.

Q        Okay.  And is this at one time?

A        No.

Q        What is that?

A        That would be going from the table to the kitchen or going to the bathroom.

Q        You mean putting it all together - - ?

A        Yeah.  Putting it all together.

Q        Well, approximately how long do you stand at one time because you feel like you when you have, when you can do this?

A        Ten minutes.

Q        What is the reason?

A        My legs start getting number, feel like they're going to sleep or cold.

Q        Okay.  You said get cold?

A        They, that's what they feel like.

Q        Okay.  All right.  What about walking?  Now, if you set out walking at your own pace and you weren't in a hurry, you weren't walking uphill or downhill, approximately how long or how far do you think you could walk before you need to get off your feet?

A        I tried that.  I don't know how to measure in distances.  Twice the length of this room.  Like to walk down and back as long as it's level.

Q        What, what is the reason that you don't walk farther than that at one time?

A        I have pain that runs from my, middle of my back down my legs and I - -

*                    *                    *

Q        All right.  Okay.  Well, let me ask you a little bit about that.  Do you watch television?

A        It's on, but I just, it's just for the noise.

Q        Okay.  Are you in front of it more or less certain times during the day?

A        I set in my recliner which is across the room.

Q        How much time do you think you're sitting in your recliner with the television on?

A        Five or six hours at least.

Q        How much of that time do you think you're actually watching something, a program or a movie or news or something like that?

A        Maybe 30 minutes.

Q        So you just, you really don't pay much attention to it.  Okay.  What about reading?  Do you do any reading, magazines, newspapers, anything like that?

A       Not anymore.   No.

Q       So at one point you did do that?

A       Yes, I love to read.

Q       What has happened with our reading?

A       Everything blurs together, start, my head starts hurting worse.

                              *            *             *

Q       All right.  And do you feel that you are depressed?

A       Very.

Q       Is there any particular cause that you've been able to identify that makes you depressed or you just can't identify it?

A       I'm only 47.  You know, I shouldn't be in this shape.  And I hate it that I can't, can't work.  I can't do the things that I used to do.

Q       So you think you, a lot of it has to do with your health?

A       Yes.

Q       How about anxiety?  Do you feel that you're anxious or upset?

A       There's days I feel like I don't even want to get up.  What's the use?

Q       Now, you're on nitroglycerin?

A       Yes, ma'am.

Q       How often do you find yourself actually taking the nitroglycerin?

A       Couple times a month.

Q       Does one pill assist you as far as - -

A       Sometimes one and sometimes I'll have to take the three.

E.　　　Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•　　　Worked 2.5 hours per day as a CNA during her disability period.  (Tr. 116).

•　　　As a CNA, did housework, general grooming, and preparation of meals.  (Tr. 116).

•　　　As CNA, climbed and kneeled.  (Tr. 116).

•　　　Able to prepare toast, cereal, microwave meals, and sandwiches.  (Tr. 127, 129)

•　　　Leaves the house for shopping, and doctors appointments.  (Tr. 127, 131)

•　　　Listens to the radio and watches television.  (Tr. 127)

•　　　Feeds her dogs.  (Tr. 128)

•　　　Able to shower.  (Tr. 128)

•　　　Able to load clothes into the washing machine and dryer.  Unable to fold them.  (Tr. 129)

•　　　Goes out onto the porch daily.  (Tr. 130)

•　　　Able to drive a car.  (Tr. 130)

•　　　Shops twice a month - for a couple hours each time - for groceries, gifts, and household supplies.  When shops, uses a cane and leans on cart.  (Tr. 130)

•　　　Able to pay bills, count change, handle a savings account, use a checkbook/money order.  (Tr. 130)

•　　　Does puzzles a couple of times per year.  (Tr. 131)

•　　　Sits and talks with others.  (Tr. 131)

- Follows written instructions "pretty well."  (Tr. 132)

- Follows spoken instructions "okay."  (Tr. 132)

- Gets along with authority figures.  (Tr. 133)

- Used roto tiller.  (Tr. 169)

- Smokes half of to one full pack of cigarettes per day.  (Tr. 377).

- Walked with a cane at the hearing; uses cane more for balance than weight bearing.  (Tr. 622, 630)

- Does not use cane when walking in house.  (Tr. 631)

- Has difficulty dressing herself.  (Tr. 638)

- Able to carry a five pound bag of flour on a regular basis without pain.  (Tr. 639)

- Able to sit for 30 minutes, with shifting.  (Tr. 640)

- 5'3", 190 pounds.  (Tr. 618)

- Smokes half a pack of cigarettes per day.  (Tr. 619)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant alleges 1) the ALJ erred in step two of his analysis by concluding Claimant's mental impairments and fibromyalgia were not severe; 2) the ALJ erred in step three of his analysis by failing to consider Claimant's combined impairments, and failing to consider Dr. Pascasio's opinion that Claimant's combined impairments might equal a lung Listing; 3) the ALJ's assignment to Claimant of a light RFC is not supported by substantial evidence; 4) the ALJ's negative comments regarding Claimant and her counsel evidence the ALJ's bias against Claimant.

Commissioner responds 1) the ALJ properly concluded Claimant's mental impairments and

fibromyalgia were not severe; 2) the ALJ did consider Claimant's impairment in combination, and Dr. Pascasio did not render the opinion alleged by Claimant; 3) the ALJ's light RFC finding is supported by substantial evidence; 4) the ALJ was not biased against Claimant.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c)); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. Discussion

1. Whether the ALJ Erred at Step Two of the Sequential Analysis.

Claimant alleges the ALJ erred in finding at step two the record does not support the severity of mental impairment alleged by Claimant. Claimant alleges the ALJ, in making his finding, improperly discredited Dr. Boyce's report, and Ms. Hagan's/Ms. Morello's psychological report. Claimant also alleges the ALJ failed to find her fibromyalgia was a severe impairment. Commissioner contends the ALJ properly analyzed Claimant's mental impairments and fibromyalgia, and properly considered Dr. Boyce's, Ms. Hagan's, and Ms. Morello's reports.

An impairment is severe when, whether by itself or in combination with other

impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). "The claimant's maladies must be considered in combination and must not be fragmentized in evaluating their effects." <u>Hicks v. Gardner</u>, 393 F.2d 299, 302 (1968). When evaluating whether a claimant's mental impairments are "severe," the ALJ must first determine whether the medical evidence shows a medically determinable physical or mental impairment exists which would "reasonably be expected to produce the symptoms" alleged. 20 C.F.R. § 404.1529; SSR 96-7p. If the ALJ finds such an impairment exists, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects" of the symptoms of the impairment to determine the impairment's impact on that individual's ability to work. SSR 96-7p.

<u>Severity of Claimant's Mental Impairments</u>

The ALJ in the present case considered the evidence in the record and evidence of Claimant's lifestyle, and concluded the objective medical evidence in the record did <u>not</u> support the severity of mental impairment alleged by Claimant. (Tr. 17). His conclusion was based on the absence from the record of any report of Claimant's past mental health treatment, and the fact the only mental health diagnoses in the record were made by a) "providers who are not mental health specialists" (Dr. Boyce), or b) "attorney-referred" psychologists (Ms. Hagan and Ms. Morello). (<u>Id.</u>). Despite his above conclusion, the ALJ gave Claimant the "extreme benefit of the doubt" and included Claimant's depression and anxiety disorder as "severe" impairments. (Tr. 17).

The Court finds the ALJ's ultimate conclusion regarding the severity of Claimant's mental impairments is supported by substantial evidence. <u>First</u>, as the ALJ noted, the evidence

in the record suggests Claimant was mentally impaired but not to the degree alleged by Claimant. For example, she retains the mental ability to work as a certified nurse, to prepare small meals, shop, do laundry, drive a car, do puzzles, and sit and talk with others. (Tr. 116, 127, 129, 130, 131). Additionally, numerous medical examiners reported Claimant's mental impairments imposed only a moderate, as opposed to significant, limitation on her work-related abilities. (Tr. 339, 412, 418). Second, and most notably, the ALJ reasonably found significant the fact Claimant did not allege she was mentally impaired until after meeting with her counsel in August 2004. (Tr. 108).

The Court also finds the ALJ's treatment of Dr. Boyce's, Ms. Hagan's, and Ms. Morello's reports is supported by substantial evidence and involves a correct application of law. Regarding the ALJ's treatment of Dr. Boyce's opinion Claimant suffered from situational depression/anxiety, the ALJ was justified in assigning less weight to Dr. Boyce's opinions (Exhibits 20F, 24F, and 28F) because 1) Dr. Boyce was not a mental health expert, and 2) Dr. Boyce's conclusions relied primarily on Claimant's subjective complaints as opposed to objective medical evidence. See 20 C.F.R. § 404.1527(d) [providing the ALJ's evaluation of medical evidence may include consideration of the absence of "medical signs and laboratory findings" and "specialization."]. Regarding the ALJ's treatment of Ms. Hagan's and Ms. Morello's report dated October 5, 2005, (Tr. 412), the ALJ did not discredit the report solely because the evaluators were attorney-referred. Rather, he discredited the report because their opinions appeared entirely based on Claimant's subjective complaints, and because Claimant had made no prior mention of her mental impairments until hiring her attorney. (Tr. 26).

Severity of Claimant's Fibromyalgia

Claimant alleges the ALJ failed to find her fibromyalgia was a severe impairment. Claimant's allegation has merit, as reflected in the ALJ's decision. (Tr. 16). However, the ALJ's reason for failing to make such a finding stems from the fact that the evidence of Claimant's fibromyalgia diagnosis (see Tr. 505, 506) was not part of the record at the time the ALJ issued his decision. The evidence was subsequently presented to the Appeals Council and added to the record. (See Tr. 6, Exhibit AC-2). The Appeals Council affirmed the ALJ's decision notwithstanding the new evidence of Claimant's fibromyalgia. The Court has considered the evidence of Claimant's fibromyalgia, see Wilkins v. Sec'y, Dep't of Health & Human Servs, 953 F.2d 93, 96 (4th Cir. 1991) [holding reviewing Court is obligated to consider evidence added to the administrative record by the Appeals Council subsequent to the ALJ's decision] and finds the new evidence of Claimant's fibromyalgia does not render the ALJ's conclusions unsupported by substantial evidence. The Court so finds because the basis for Claimant's fibromyalgia diagnosis - widespread pain - was considered by the ALJ in his credibility analysis. (Tr. 20-22).

For the foregoing reasons, the Court recommends relief be denied.

2.    Whether the ALJ Erred at Step Three of the Sequential Analysis.

Claimant alleges the ALJ erred in step three of his analysis. She specifically alleges the ALJ failed to consider the effect of Claimant's "whole host of subjective complaints" related to fibromyalgia combined with her other severe impairments. She further alleges the ALJ failed to compare the combination to the requirements of an "analogous listing." Finally, Claimant alleges the ALJ failed to consider Dr. Pascasio's opinion that Claimant's combined impairments might equal a lung Listing. Commissioner contends the ALJ did consider the severity of her

combined impairments.  Commissioner further contends Dr. Pascasio never made the finding alleged by Claimant.

At step three of the sequential analysis, an ALJ must determine whether a claimant's impairment, or combination of impairments,  meets or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  SSR 86-6.  A finding that a claimant's impairment meets or equals a Listing in Appendix 1 results in a determination of disability without the need for further review, because the impairments listed in Appendix 1 "would ordinarily prevent an individual from engaging in any gainful activity."  Id.  The claimant bears the burden of proving that their impairment meets all - not merely some - of the requirements of a listed impairment.  Fleming v. Barnhart, 284 F. Supp. 2d 256, 269 (D. Md. 2003); see, also, Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

In his analysis at step three, the ALJ has a duty to consider the combined effects of a claimant's impairments.  20 C.F.R. §§ 404.1426, 404.1512; Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989).  "Congress explicitly requires that "the combined effects of all the individual's impairments' be considered, 'without regard to whether any such impairment if considered separately would be sufficiently severe."  Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citation omitted).  The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."  Id. at 50.  Additionally, "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."  Id.

The Court finds Claimant's present allegations are without merit.  First, the ALJ in the clearly indicated his awareness of his obligation to consider claimant's impairments in combination.  (See Tr. 15).  Second, the ALJ clearly considered the impact of Claimant's

subjective complaints (presumably related to Claimant's fibromyalgia) on her mental health impairments. (Tr. 17-20). <u>Third</u>, although Claimant alleges the ALJ should have compared Claimant's combined impairments to an "analogous listing," Claimant fails to identify what listing she believes her combined impairments may have met or equaled. Therefore, the Court cannot assess whether the ALJ erred in failing to analyze a specific combination of Claimant's impairments. <u>Finally</u>, the ALJ did not, as Claimant alleges, erroneously overlook Dr. Pascasio's opinion Claimant's combined impairments might equal a lung Listing. Dr. Pascacio's report consisted of a Physical RFC Assessment and indicated Claimant was capable of performing light work. (Tr. 331). Dr. Pascacio made no mention of a lung listing. He merely concluded Claimant should avoid concentrated exposure of hazards. (Tr. 331). Therefore, the ALJ did not err in failing to discuss Dr. Pascacio's opinion on a lung listing.

For the aforementioned reasons, the Court recommends relief be denied.

3.    <u>Whether the ALJ's Determination of a Light RFC is Supported by Substantial Evidence</u>.

Claimant alleges the ALJ erred in concluding she retained the RFC to perform light work. Claimant specifically alleges the ALJ failed to consider Dr. Boyce's opinion Claimant was limited to sedentary work, and Dr. Stewart's and Jeri Oney's opinion Claimant could do only "telephone work." Commissioner alleges the ALJ's light RFC finding is supported by substantial evidence, namely the opinion of two state agency physicians. Commissioner further argues Dr. Boyce's and Dr. Stewart's opinion regarding Claimant's RFC are entitled to little weight.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520, 404.1545. The RFC is a determination of the most a claimant can do

despite his limitations.  20 C.F.R. § 404.1545.  A claimant's RFC is to be determined only after the ALJ has considered all the relevant medical evidence of the claimant's impairments as well as descriptions of subjective symptoms such as pain.  Id. at § 404.1529(a); see, also, Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Symptoms of pain must be considered in accordance with the two-step process set forth in Craig, 76 F.3d at 585.  First, the ALJ must determine whether there exists a medically determinable impairment capable of causing the symptoms alleged.  Id. at 594.  Second, if the claimant makes this showing, the ALJ must evaluate the intensity and persistence of the symptoms and the degree to which they impact the claimant's work-related abilities.  Id. at 595. The evaluation in the second prong must consider the claimant's own statements about pain as well as objective medical evidence in the record.  The claimant's own statements need not be credited to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

The ALJ in the present case concluded Claimant retained the RFC to perform a range of light work, and:

> "requires a sit/stand option/can perform all postural movements occasionally, except cannot kneel, crawl, or climb ladders, ropes, or scaffolds; should do no overhead lifting or reaching with the dominant right upper extremity; should do no push/pull motions with either the upper or lower extremities; should not be exposed to temperature extremes, environmental pollutants or hazards; is limited to low stress work involving no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more than occasional interaction with others."

(Tr. 20).

42

The Court has considered the record and the ALJ's decision and finds Claimant's allegations are without merit. First, substantial evidence supports the ALJ's determination Claimant could perform light work. Dr. Pascacio and Dr. Franyutti, for example, both listed Claimant's lifting limitations as meeting those of light work. (Tr. 254, 332). While both Dr. Pascacio and Dr. Franyutti included a limitation on standing/walking that resembled a "sedentary" RFC, the ALJ accommodated that "sedentary" recommendation by including in Claimant's RFC a sit/stand option and a limitation on lower extremity pushing/pulling. (Tr. 20, 25). Furthermore, although Dr. Boyce recommended a sedentary RFC, the ALJ reasonably discredited Dr. Boyce's report as being based on Claimant's subjective symptoms. (Tr. 508). Second, Claimant's lifestyle evidence suggests her mental or physical limitations were not as severe as she alleged or as found by medical experts such as Dr. Boyce. As mentioned above, Claimant retained during the relevant period the ability to work as a certified nurse, to prepare small meals, shop, do laundry, drive a car, do puzzles, and sit and talk with others. (Tr. 116, 127, 129, 130, 131). Finally, although Dr. Stewart and Jeri Oney limited Claimant to "telephone work," Dr. Stewart did not specify whether he considered "telephone work" to be sedentary or light work. (Tr. 608).

For the aforementioned reasons, the Court recommends relief be denied.

4.      Whether the ALJ Was Biased Against Claimant Such that He Could Not Fairly Rule on the Relevant Evidence and Fairly Apply the Applicable Law.

Claimant alleges the ALJ's comments on the inconsistencies in the record, Claimant's poor work record, and the questionable reliability of attorney-referred psychological evaluations, (see Tr. 17, 22, 25-26), evidence the ALJ was biased against Claimant and unable to "rule fairly

43

on the basis of the law and the evidence." Commissioner contends the ALJ was not biased against Claimant. Specifically, Commissioner responds that although the ALJ was "particularly critical" of the reliability of the attorney-referred psychological evaluations completed by Ms. Hagan and Ms. Morello, the ALJ reasonably rejected the reports on their merits. Commissioner further argues bias should not be inferred from the ALJ's consideration of the inconsistencies in Claimant's reported symptoms and Claimant's poor work record, because such consideration was not improper.

The Court agrees with Commissioner and finds Claimant has failed to establish the ALJ was biased against her. While the ALJ was, as conceded by Commissioner, particularly weary of the close overlap in time between Claimant's retention of counsel and her reports of mental impairments to Ms. Hagan and Ms. Morello, the ALJ is permitted to consider such facts. See Craig, 76 F.3d at 592-95 [holding the ALJ, when evaluating the credibility of Claimant's subjective symptoms, should consider the extent to which the Claimant's statements are consistent with the entire record]. Furthermore, the ALJ did not discredit the reports from Ms. Hagan and Ms. Morrelo solely because the evaluators were attorney-referred. (Tr. 26, 29, 403, 412). Rather, the ALJ discredited the reports because Claimant had not, prior to meeting with her counsel, alleged she was disabled by her mental impairments. Regarding the ALJ's discussion about Claimant's poor work record, the ALJ is permitted to consider the entire record, including evidence of claimant's possible motivations for secondary gain, Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996).

For the aforementioned reasons, the Court recommends relief be denied.

## IV. Claimant's Motion to Supplement Record

Claimant, in her Motion to Supplement Record (Doc. No. 14), moves the Court to allow the addition to the record of three pages. The three pages are from Claimant's counsel's file, are entitled "SOCIAL SECURITY INTAKE FORM," and are dated August 13, 2004.

Claimant argues the Court should grant her Motion because the records refute the ALJ's statement in his decision that "the claimant first complained of depression in the disability report submitted on August 13, 2004 (Exhibit 8E)." (Tr. 25). Claimant argues the intake forms, completed by a former member of counsel's staff, establish she was consistent in her complaints of mental health problems. Commissioner argues the Court should deny Claimant's Motion because Claimant has not demonstrated the forms are material, or that they "might reasonably" have changed the ALJ's decision.

While Claimant requests the Court supplement the record with the new evidence, the Court may not supplement and thereafter weigh evidence not previously considered by either the ALJ or the Appeals Council. Such conduct by the Court would improperly extend the Court's role beyond that of determining whether substantial evidence supports the ALJ's decision. See Hays, 907 F.2d at 1456 [holding it is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.]. The Court may, however, remand the case to the Commissioner for consideration of the evidence upon a showing by the claimant that the evidence is new and material, and that she had good cause for failing to incorporate the evidence at the prior proceeding. 42 U.S.C. § 405(g); Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). As the Fourth Circuit stated, "The

district court may only order additional evidence to be taken before the Commissioner upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." Smith v. Chater, 99 F.3d 635, 638 n.5 (4th Cir. 1996). The Fourth Circuit has held that evidence is new "if it is not duplicative or cumulative." Wilkins., 953 F.2d at 96. A piece of evidence "is material if there is a reasonably possibility that the new evidence would have changed the outcome." Id.

The intake forms constitute "new" evidence because they were not before the ALJ or the Appeals Council. However, Claimant has failed to demonstrate good cause for her failure to include the intake forms in the original record. She has also failed to demonstrate the forms are "material." Specifically, Claimant has failed to demonstrate the ALJ's decision "might reasonably" have been different had he known Claimant mentioned her mental health problems and medications at her intake interview. Wilkins, 953 F.3d at 96. The intake forms and Ms. Hagan's report are both dated August 13, 2004, the same day Claimant retained counsel. The intake forms would therefore likely not have assuaged the ALJ's concern with the proximity in time between Claimant's retention of counsel and her complaints of mental health problems. For these reasons, the Court DENIES Claimant's Motion to Supplement Record (Doc. No. 14).

## V. Claimant's Motion to Supplement Transcript with Lost Documents

Claimant, in her Motion to Supplement Transcript with Lost Documents (Doc. No. 15), moves the Court to allow additional evidence to be added to the transcript. The evidence consists of 4 sets of medical records each accompanied by a letter from Claimant's counsel to the Appeals Council. The medical records are from Braxton Community Health Center, Braxton County Memorial Hospital, and United Summit Center, and dated from between June 6, 2003

46

through February 2, 2007.  Claimant argues the Court should grant her Motion because the records were submitted to the Appeals Council as part of her request for review but were erroneously omitted from the transcript.  Claimant further argues the records are relevant because they document Claimant's mental health treatments beginning after the ALJ's decision and continuing for the next six to eight months.  Commissioner argues the Court should deny Claimant's Motion because the records are cumulative.

A person seeking to present evidence to the Court not put before the ALJ must show that the evidence is new and material, as well as show good cause for the failure to incorporate the evidence at the prior proceeding.  42 U.S.C. § 405(g); Wilkins, 953 F.2d at 96.  A different situation applies where the evidence was not presented to the ALJ, but was presented to the Appeals Council and was incorporated by the Appeals Council into the record.  Id.  In the latter situation, the Court should "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings."  Id.

The Court finds the records at issue in Claimant's Motion constitute "new" evidence because they were not before the ALJ, or the Appeals Council.  See 42 U.S.C. § 405(g).  The Court further finds Claimant made a good faith effort to present the records to the Appeals Council.  The Court does not find, however, that the records are "material" such that remand under § 405(g) is warranted.  In other words, the Court finds the records fail to establish that Claimant's depression was any more severe than suggested in the original transcript such that there is a "reasonable possibility the records would have changed the outcome of the case." Wilkins, 953 F.3d at 96.  Accordingly, the Court DENIES Claimant's Motion to Supplement Transcript with Lost Documents.

## VI. **Recommendations and Orders**

For the foregoing reasons, I **RECOMMEND**:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err at step two or three of the analysis; his assignment to Claimant of a light RFC is supported by substantial evidence; and there is no evidence the ALJ was biased against Claimant.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

For the foregoing reasons, I **ORDER**:

1.     Claimant's Motion to Supplement Record (Doc. No. 14) be **DENIED** because Claimant failed to demonstrate cause for her failure to incorporate the forms at the prior proceeding, and that the forms are "material."

2.     Claimant's Motion to Supplement Transcript with Lost Documents (Doc. No. 15) be **DENIED** because Claimant failed to demonstrate the records at issue are "material."

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation and Order, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk is also directed to transmit copies of this Report and Recommendation and Order to the plaintiff and counsel of record, as applicable.

DATED: August 21, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE